**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **TRISTANO KORLOU and JESSICA CAMPBELL, individually and on behalf of all others similarly situated,**<br><br>***Plaintiff,***<br><br>**v.**<br><br>**TRANSUNION, LLC**<br>***Defendant.*** | Case No.: 25-11569<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiffs Tristano Korlou and Jessica Campbell ("Plaintiffs") bring this Class Action Complaint against Defendant TransUnion, LLC, ("Defendant" or "TransUnion") as individuals and on behalf of all others similarly situated, and allege, upon personal knowledge as to Plaintiffs' own actions and to counsels' investigation, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1. Plaintiffs bring this class action against Defendant for its failure to properly secure and safeguard personally identifiable information ("PII") of its clients including but not limited to: Date of Birth and Social Security Number.[1]

[1] *See* Notice Letter, Exhibit A

2. TransUnion is a credit reporting agency.[2] The company collects and aggregates consumer information, providing credit reports and scores to lenders and other businesses to help them make informed decision about credit application.

3. Upon information and belief, Defendant collects personal data in connection with Personally Identifiable Information (PII), Financial Information, Online and Digital Banking Data and Business Account information (for commercial members).

4. On or about July 28, 2025, Defendant experienced a cyber incident involving a third-party application serving their U.S. consumer support operations and determined that Plaintiffs' personal information—which was entrusted to Defendant on the mutual understanding that Defendant would protect it against unauthorized disclosure—was accessed and exfiltrated in a data breach (hereafter referred to as the "Data Breach").

5. Around August 26, 2025, Defendant began sending out data breach notice letters to individuals who were affected by the data breach. Omitted from the data breach notice letter were the details of the root cause of the Data Breach and the vulnerabilities exploited. To date, these omitted details have not been explained or clarified to Plaintiffs, who retain a vested interest in ensuring that their PII remains protected.

6. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiffs' data was a known risk to Defendant, and thus, Defendant was on notice that failing to take steps necessary to secure the information from those risks left the data in a dangerous condition.

7. The Data Breach was a direct result of Defendant's failure to implement reasonable safeguards to protect PII from a foreseeable and preventable risk of unauthorized disclosure. Had

[2] https://www.transunion.com/about-us (last accessed on September 22, 2025)

Defendant implemented administrative, technical, and physical controls consistent with industry standards and best practices, it could have prevented the Data Breach.

8. Defendant's conduct resulted in the unauthorized disclosure of Plaintiffs' private information to cybercriminals. The unauthorized disclosure of Plaintiff's PII constitutes an invasion of a legally protected privacy interest, that is traceable to the Defendant's failure to adequately secure the PII in its custody, and has resulted in actual, particularized, and concrete harm to the Plaintiffs. Plaintiffs suffered actual injury in the form of damages to and diminution in the value of the PII that was compromised in the Data Breach. The injuries Plaintiffs suffered, as described herein, can be redressed by a favorable decision in this matter.

9. Defendant has not provided any assurances that: all data acquired in the Data Breach, or copies thereof, have been recovered or destroyed; or, that Defendant has modified its data protection policies, procedures, and practices sufficient to avoid future, similar, data breaches.

10. Defendant's conduct, as evidenced by the circumstances of the Data Breach, has created a substantial risk of future identity theft, fraud, or other forms of exploitation. The circumstances demonstrating a substantial risk of future exploitation include, but are not limited to:

a. **Sensitive Data Type**: The data acquired in the Data Breach included name, date of birth and unredacted Social Security Number. Upon information and belief, this category of data is used by cybercriminals to perpetuate fraud, identity theft, and other forms of exploitation.[3]
b. **Data Breach Type**: In July 30, 2025, suspicious activity was detected in Defendant TransUnion's network, eventually confirmed as a new unauthorized access incident. The breach, which occurred on July 28, 2025, involved no known ransomware actor, yet affected more than 4,000,000.00 clients[4]. Investigations concluded in August of 2025, and notifications began soon after. Although no ransom demand or group affiliation was made public, the scope of the data compromised suggests a targeted, silent operation.

---

[3] https://www.f-secure.com/us-en/articles/why-do-hackers-want-your-personal-information
[4] See, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/3dcd9b7c-bce3-4685-bffd-f728ce96e2fd.html (last accessed on September 22, 2025)

c. **Data Misuse**: The data acquired in the Data Breach could be leaked on the dark web. The dark web uses a series of encrypted networks to hide users' identities, which makes it convenient for criminals to buy and sell illegally obtained data. Many criminals purchase stolen personal data off the dark web before launching social engineering-based attacks. A social engineering attack is a method of using psychological manipulation to deceive a victim and gain access to a computer system or to steal sensitive information such as login credentials. Social engineering attacks that can be launched using names, telephone numbers and email addresses include phishing, smishing (SMS message), vishing (voice messaging), pretexting, and baiting attacks.

11. The imminent risk of future harm resulting from the Data Breach is traceable to the Defendant's failure to adequately secure the PII in its custody, and has created a separate, particularized, and concrete harm to the Plaintiffs.

12. More specifically, the Plaintiffs' exposure to the substantial risk of future exploitation caused them to: (i) spend money on mitigation measures like credit monitoring services and/or dark web searches; (ii) lose time and effort spent responding to the Data Breach; and/or (iii) experience emotional distress associated with reviewing accounts for fraud, changing usernames and passwords or closing accounts to prevent fraud, and general anxiety over the consequences of the Data Breach. The harm Plaintiffs' suffered can be redressed by a favorable decision in this matter.

13. Plaintiffs face a substantial risk of future phishing, or other social engineering attacks where their full names, addresses, email addresses, and phone numbers were stolen by a cybercriminal, known for stealing and reselling personal data on the dark web. Names, telephone numbers and email addresses can be used by cybercriminals to launch social engineering attacks designed to trick individuals into giving away sensitive information. Plaintiffs have incurred out of pocket costs for purchasing products to protect from phishing, smishing (SMS message), vishing (voice messaging), pretexting, and other social engineering-based attacks.

14. Armed with the PII acquired in the Data Breach, data thieves have already engaged in theft and can, in the future, commit a variety of crimes including, opening new financial accounts, taking out loans, using Plaintiffs' information to obtain government benefits, file fraudulent tax returns, obtain driver's licenses, and give false information to police during an arrest.

15. According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and other private information increases." [5] Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[6]

16. According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and other private information increases." [7] Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[8]

17. The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by Plaintiffs and some Class Members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone

[5] *See*,https://www.ssa.gov/phila/ProtectingSSNs.htm#:~:text=An%20organization's%20collection%20and%20use,and%20other%20private%20information%20increases. (Last accessed September 22, 2025).
[6] *Id.*
[7] *See*,https://www.ssa.gov/phila/ProtectingSSNs.htm#:~:text=An%20organization's%20collection%20and%20use,and%20other%20private%20information%20increases. (Last accessed September 22, 2025).
[8] *Id.*

> is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[9]

18. In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[10] "Someone who has your SSN can use it to impersonate you, obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[11]

19. Note, it is not an easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

20. Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[12]

21. For these reasons, some courts have referred to Social Security numbers as the "gold standard" for identity theft. *Portier v. NEO Tech. Sols.*, No. 3:17-CV-30111, 2019 WL 7946103, at *12 (D. Mass. Dec. 31, 2019) ("Because Social Security numbers are the gold standard

---

[9] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf (Last accessed September 22, 2025).

[10] *See* https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft/ (Last accessed September 22 2025).

[11] *See* https://www.investopedia.com/terms/s/ssn.asp (Last accessed September 22, 2025).

[12] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft (Last accessed September 22, 2025).

for identity theft, their theft is significant . . . . Access to Social Security numbers causes long-lasting jeopardy because the Social Security Administration does not normally replace Social Security numbers."), report and recommendation adopted, No. 3:17-CV-30111, 2020 WL 877035 (D. Mass. Jan. 30, 2020); *see also McFarlane v. Altice USA, Inc*., 2021 WL 860584, at *4 (citations omitted) (S.D.N.Y. Mar. 8, 2021) (the court noted that Plaintiff's Social Security numbers are: arguably "the most dangerous type of personal information in the hands of identity thieves" because it is immutable and can be used to "impersonat[e] [the victim] to get medical services, government benefits, ... tax refunds, [and] employment." . . . Unlike a credit card number, which can be changed to eliminate the risk of harm following a data breach, "[a] social security number derives its value in that it is immutable," and when it is stolen it can "forever be wielded to identify [the victim] and target his in fraudulent schemes and identity theft attacks.")

22. Similarly, the California state government warns consumers that: "[o]riginally, your Social Security number (SSN) was a way for the government to track your earnings and pay you retirement benefits. But over the years, it has become much more than that. It is the key to a lot of your personal information. With your name and SSN, an identity thief could open new credit and bank accounts, rent an apartment, or even get a job."[13]

23. As a result of the Data Breach, Plaintiffs and Class Members suffered injuries including, but not limited to: (i) invasion of privacy; (ii) theft of PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) an increase in spam calls, texts, and/or emails; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and increased risk their PII will be further misused, where: (a) their data remains unencrypted and

[13] *See* https://oag.ca.gov/idtheft/facts/your-ssn (Last accessed July 21, 2025).

available for unauthorized third parties to access on the dark web or otherwise; and (b) remains backed up under Defendant's possession or control and is subject to further unauthorized disclosures so long as Defendant fails to implement appropriate and reasonable measures to protect the data.

24. Plaintiffs bring this class action lawsuit individually, and on behalf of all those similarly situated, to address Defendant's inadequate data protection practices and for failing to provide timely and adequate notice of the Data Breach.

25. Through this Complaint, Plaintiffs seek to remedy these harms individually, and on behalf of all similarly situated individuals whose PII was accessed during the Data Breach.

26. Plaintiffs have a continuing interest in ensuring that personal information is kept confidential and protected from disclosure, and Plaintiffs should be entitled to injunctive and other equitable relief.

## JURISDICTION & VENUE

27. This Court has subject matter jurisdiction over this action under 28 U.S.C.§1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000.00, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant[14].

28. This Court has personal jurisdiction over Defendant because its principal place of business is in this District. Defendant also purposefully availed itself of the laws, rights, and benefits of the state of Illinois.

[14] Defendant's Notice to the Attorney General of Maine and Texas about the data breach's impact on residents of that state prove the class satisfies the minimal diversity requirement. See: https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/3dcd9b7c-bce3-4685-bffd-f728ce96e2fd.html and https://www.documentcloud.org/documents/26078139-transunion-breach-texas/ (last accessed September 22, 2025).

29. Venue is proper under 28 U.S.C §1391(b) because Defendant maintains a principal place of business in this District and a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

**PARTIES**

30. Plaintiff Tristano Korlou is a citizen of the State of New York. At all relevant times, Plaintiff has been a resident of Spencerport, New York. Spencerport is located in Monroe County, New York.

31. Plaintiff Jessica Campbell is a citizen of the state of Tennessee. At all relevant times, Plaintiff has been a resident of Nashville, Tennessee. Nashville is located in Davidson County, Tennessee.

32. Defendant, TransUnion, maintains a principal place of business at 555 West Adams, Chicago, Illinois 60661.

**FACTUAL ALLEGATIONS**

33. Plaintiff Korlou received a notice of the Data Breach on, or about, August 26, 2025. *See,* **Exhibit A**. The breach notice letter provides a host of other actions Plaintiff should take, has taken, or will take in the future to protect himself from future exploitation.

34. Plaintiff Campbell received a notice of the Data Breach on, or about, September 2, 2025. *See,* **Exhibit A**. The breach notice letter provides a host of other actions Plaintiff should take, has taken, or will take in the future to protect herself from future exploitation.

35. Plaintiffs have spent time, and will continue to spend time, reviewing their records and accounts for indicia of fraud, contacting utilities to ensure no one obtained cable, electric, water, or other similar services in his name, reading the breach notice letter, and taking other actions in response to the Data Breach. Plaintiffs experience anxiety and stress over the

unauthorized disclosure of their Social Security number to cybercriminals and the potential for future exploitation presented by the Data Breach.

36. Through this Complaint, Plaintiffs seek redress individually, and on behalf of all similarly situated individuals, for the damages that resulted from the Data Breach.

37. In the course of their relationship, Defendant collected or created PII related to Plaintiffs and Class Members.

38. Defendant promised to use reasonable technical, administrative, and physical safeguards to protect the PII it collected or created. These promises were contained in the applicable privacy policy and through other disclosures in compliance with statutory privacy requirements.

39. Plaintiffs and the Class Members relied on Defendant's representations and on this sophisticated business entity to keep their PII confidential, securely maintained, and to make only authorized disclosures of this information.

40. On, or about, July 30, 2025, Defendant detected unusual activity on its IT systems and determined that Plaintiff's personal information was accessed and exfiltrated in the Data Breach.

41. On or about August of 2025, Defendant started to send out data breach notice letters to individuals who were affected by the data breach. Plaintiffs recently received their breach notice letters[15].

***Data Breaches Are Avoidable***

42. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiff's information was a known risk to Defendant, and thus, Defendant

[15] *See*, **Exhibit A.**

was on notice that failing to take steps necessary to secure the data from those risks left the data in a dangerous condition.

43. Upon information and belief, the Data Breach was a direct result of Defendant's failure to: (i) identify risks and potential effects of collecting, maintaining, and sharing personal information; (ii) adhere to its published privacy practices; (iii) implement reasonable data protection measures for the collection, use, disclosure, and storage of sensitive PII; and/or (iv) ensure its third-party vendors were required to implement reasonable data protection measures consistent with Defendant's data protection obligations.

44. The Federal Trade Commission's Standards for Safeguarding Customer Information (the "Safeguards Rule") 16 CFR §314, requires credit reporting agencies and other covered financial institutions to develop, implement, and maintain an information security program with administrative, technical, and physical safeguards designed to protect customer information. The primary requirements of an information security program are:

a. Designate a qualified individual to implement and supervise the information security program.

b. Conduct an assessment to determine foreseeable risks and threats – internal and external – to the security, confidentiality, and integrity of customer information.

c. Design and implement safeguards to control the risks identified through the risk assessment.

d. Regularly monitor and test the effectiveness of the chosen safeguards.

e. Provide staff with security awareness training and schedule regular refreshers.

f. Select service providers with the skills and experience to maintain appropriate safeguards. Include security expectations in vendor contracts, monitor the service provider's work, and provide for periodic reassessments of their suitability.

g. Ensure the information security program remains current. It should reflect changes to operations, changes based on information gained from risk assessments, changes due to emerging threats, changes in personnel, and changes necessitated by other circumstances that may have a material impact on the information security program.

h. Create a written incident response plan.

i. Require the "Qualified Individual" to report to the Board of Directors, in writing, at least annually.[16]

45. Given that Defendant is a financial institution that collected, used, and stored sensitive customer information, Defendant could and should have identified the risks and potential effects of collecting, maintaining, and sharing personal information.

46. Without identifying the potential risks to the personal data in Defendant's possession, or under Defendant's control, Defendant could not identify and implement the necessary administrative, technical, and physical safeguards to protect customer information.

47. Defendant could and should have implemented administrative, physical, and technical safeguards including, but not limited to, the following:

Administrative Safeguards

a. Implement policies and procedures to prevent, detect, contain, and correct security violations.

b. Conduct an accurate and thorough assessment of the potential risks and vulnerabilities to the confidentiality, integrity, and availability of PII held by the Defendant.

c. Implement security measures sufficient to reduce risks and vulnerabilities to a reasonable and appropriate level.

d. Apply appropriate sanctions against employees who fail to comply with the Defendant's security policies and procedures.

e. Implement procedures to regularly review records of information system activity, such as audit logs, access reports, and security incident tracking reports.

f. Identify a security official who is responsible for the development and implementation of the Defendant's policies and procedures to prevent, detect, contain, and correct security violations.

g. Implement procedures: (i) for the authorization and/or supervision of employees who work with sensitive PII or in locations where it might be accessed; (ii) to determine whether an employee's access to sensitive PII is appropriate; and (iii) for terminating access to sensitive customer information when the employment of, or other arrangement with, a workforce member ends.

[16] See, https://www.ftc.gov/business-guidance/resources/ftc-safeguards-rule-what-your-business-needs-know (last accessed September 22, 2025).

h. Implement policies and procedures that, based upon the Defendant's access authorization policies, establish, document, review, and modify a user's right of access to a workstation, transaction, program, or process.

i. Implement a security awareness and training program for all members of Defendant's workforce, including procedures for guarding against, detecting, and reporting malicious software, vishing, phishing and other social engineering-based attacks.

j. Implement policies and procedures to address how the Defendant will identify and respond to suspected or known security incidents; mitigate, to the extent practicable, known harmful effects of security incidents; and document security incidents and their outcomes.

k. Establish (and implement as needed) policies and procedures for responding to an emergency or other occurrence that damages systems that contain PII.

l. Perform a periodic technical and nontechnical evaluation in response to environmental or operational changes affecting the security of PII.

m. Contractually obtain satisfactory assurances that vendors will appropriately safeguard customer information.

n. Create a "culture of security" by implementing a regular schedule of employee training. Update employees as you find out about new risks and vulnerabilities.

o. Tell employees about your company policies regarding keeping information secure and confidential. Post reminders in areas where sensitive information is used or stored, as well as where employees congregate.

p. Teach employees about the dangers of phishing attempts—emails containing information that makes the emails look legitimate. These emails may appear to come from someone within your company, generally someone in a position of authority. Make it office policy to independently verify any emails requesting sensitive information.

Physical Safeguards

q. Implement policies and procedures to limit physical access to its electronic information systems and the facility or facilities in which they are housed, while ensuring that properly authorized access is allowed.

r. Implement policies and procedures that specify the proper functions to be performed, the manner in which those functions are to be performed, and the physical attributes of the surroundings of a specific workstation or class of workstation that can access sensitive customer information.

s. Implement policies and procedures that govern the receipt and removal of hardware and electronic media that contain sensitive customer information into and out of a facility, and the movement of these items within the facility.

Technical Safeguards

t. Implement procedures to verify that a person or entity seeking access to sensitive customer information is the one claimed.

u. Regularly patch critical vulnerabilities in operating systems, software, and firmware on devices. Consider using a centralized patch management system.

v. Check expert websites (such as www.us-cert.gov) and your software vendors' websites regularly for alerts about new vulnerabilities and implement policies for installing vendor-approved patches to correct problems.

w. Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks. Depending on your circumstances, appropriate assessments may range from having a knowledgeable employee run off-the-shelf security software to having an independent professional conduct a full-scale security audit.

x. Scan computers on your network to identify and profile the operating system and open network services. If you find services that you don't need, disable them to prevent hacks or other potential security problems.

y. Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email.

z. Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

aa. Configure firewalls to block access to known malicious IP addresses.

bb. Set anti-virus and anti-malware programs to conduct regular scans automatically.

cc. Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

dd. Configure access controls—including file, directory, and network share permissions— with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

ee. Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

ff. Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

gg. Consider disabling Remote Desktop protocol (RDP) if it is not being used.

hh. Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

ii. Execute operating system environments or specific programs in a virtualized environment.

jj. Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.

kk. Conduct an annual penetration test and vulnerability assessment.

ll. Secure your backups.[17]

mm. Identify the computers or servers where sensitive customer information is stored.

nn. Identify all connections to the computers where you store sensitive information. These may include the internet, electronic cash registers, computers at your branch offices, computers used by service providers to support your network, digital copiers, and wireless devices like smartphones, tablets, or inventory scanners.

oo. Don't store sensitive consumer data on any computer with an internet connection unless it's essential for conducting your business.

pp. Encrypt sensitive information that you send to third parties over public networks (like the internet) and encrypt sensitive information that is stored on your computer network, laptops, or portable storage devices used by your employees. Consider also encrypting email transmissions within your business.

qq. Regularly run up-to-date anti-malware programs on individual computers and on servers on your network.

rr. Restrict employees' ability to download unauthorized software. Software downloaded to devices that connect to your network (computers, smartphones, and tablets) could be used to distribute malware.

ss. To detect network breaches when they occur, consider using an intrusion detection system.

tt. Before you outsource any of your business functions investigate the company's data security practices and compare their standards to yours.[18]

48. Considering the Data Breach involved a third-party application with access to sensitive customer information, Defendant should have configured and managed access, permissions, and implemented user training according to industry best practices.

49. Defendant knew and understood unencrypted PII is valuable and highly sought after by cybercriminals seeking to illegally monetize that data. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding PII and of the foreseeable

---

[17] *How to Protect Your Networks from Ransomware*, at p.3, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (accessed September 22, 2025).

[18] *Protecting Personal Information: A Guide for Business*, https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (accessed September 22, 2025).

consequences that would occur if a data breach occurred, including the significant cost that would be imposed on Plaintiffs and the Class Members as a result.

***Plaintiffs and Class Members Sustained Damages in the Data Breach***

50. The invasion of the Plaintiff's and Class Members' privacy suffered in this Data Breach constitutes an actual, particularized, redressable injury traceable to the Defendant's conduct. As a consequence of the Data Breach, Plaintiffs and Class Members sustained monetary damages that exceed the sum or value of $5,000,000.00.

51. Additionally, Plaintiffs and Class Members face a substantial risk of future identity theft, fraud, or other exploitation where their names, social security numbers, and dates of birth were targeted by a sophisticated hacker. The substantial risk of future identity theft and fraud created by the Data Breach constitutes a redressable injury traceable to the Defendant's conduct.

52. Upon information and belief, a criminal can easily link data acquired in the Data Breach with information available from other sources to commit a variety of fraud related crimes. An example of criminals piecing together bits and pieces of data is the development of "Fullz" packages.[19] With "Fullz" packages, cyber-criminals can combine multiple sources of PII to apply for credit cards, loans, assume identities, or take over accounts.

53. Given the type of targeted attack in this case, the sophistication of the criminal claiming responsibility for the Data Breach, the categories of data involved in the Data Breach, the hacker's behavior in prior data breaches, the ability of criminals to link data acquired in the Data Breach with information available from other sources, and the fact that the stolen information has

[19] "Fullz" is term used by cybercriminals to describe "a package of all the personal and financial records that thieves would need to fraudulently open up new lines of credit in a person's name." A Fullz package typically includes the victim's name, address, credit card information, social security number, date of birth, bank name, routing number, bank account numbers and more. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm

been placed, or will be placed, on the dark web, it is reasonable for Plaintiffs and the Class Members to assume that their PHI/PII was obtained by, or released to, criminals intending to utilize the data for future identity theft-related crimes or exploitation attempts.

54. The substantial risk of future identity theft, fraud, or other exploitation that Plaintiffs and Class Members face is sufficiently concrete, particularized, and imminent that it necessitates the present expenditure of funds to mitigate the risk. Consequently, Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to understand and mitigate the effects of the Data Breach.

55. For example, the Federal Trade Commission has recommended steps that data breach victims take to protect themselves and their children after a data breach, including: (i) contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity); (ii) regularly obtaining and reviewing their credit reports; (iii) removing fraudulent charges from their accounts; (iv) closing new accounts opened in their name; (v) placing a credit freeze on their credit; (vi) replacing government-issued identification; (vii) reporting misused Social Security numbers; (viii) contacting utilities to ensure no one obtained cable, electric, water, or other similar services in their name; and (ix) correcting their credit reports.[20]

56. As a consequence of the Data Breach, Plaintiffs and Class Members sustained or will incur monetary damages to mitigate the effects of an imminent risk of future injury. The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year. The cost of dark web scanning and monitoring services can cost around $180 per year.

[20]*See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps

57. As a result of the Data Breach, Plaintiff's and Class Members' PII, which has an inherent market value in both legitimate and illegitimate markets, has been damaged and diminished by its unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the PII is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

58. Personal information is of great value, in 2019, the data brokering industry was worth roughly $200 billion.[21] Data such as name, address, phone number, and credit history has been sold at prices ranging from $40 to $200 per record.[22] Sensitive PII can sell for as much as $363 per record.[23] Further, a stolen medical identity has a $50 value on the black market.[24]

59. Furthermore, Defendant's poor data security practices deprived Plaintiffs and Class Members of the benefit of their bargain. By transacting business with Plaintiffs and Class Members, collecting their PII, and then permitting the unauthorized disclosure of the information, Plaintiffs and Class Members were deprived of the benefit of their bargain.

60. When agreeing to pay Defendant for products or services, consumers understood and expected that they were, in part, paying for the protection of their personal data, when in fact, Defendant did not invest the funds into implementing reasonable data security practices.

[21] *Column: Shadowy data brokers make the most of their invisibility cloak*, https://www.latimes.com/business/story/2019-11-05/column-data-brokers

[22] *In the Dark*, VPNOverview, 2019, available at: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/

[23] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[24] Study: Few Aware of Medical Identity Theft Risk, Claims Journal (June 14, 2012), https://www.claimsjournal.com/news/national/2012/06/14/208510.htm

Accordingly, Plaintiffs and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant.

61. Through this Complaint, Plaintiffs seek redress individually, and on behalf of all similarly situated individuals, for the damages that resulted from the Data Breach.

## CLASS ALLEGATIONS

62. Plaintiffs bring this nationwide class action individually, and on behalf of all similarly situated individuals, pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

63. The Class that Plaintiffs seek to represent is defined as follows:

**Nationwide Class**

All individuals residing in the United States whose PII was accessed and acquired by an unauthorized party as a result of a data breach that occurred on July 28, 2025 as reported by Defendant (the "Class").

64. The Class shall be referred to as the "Class" or "Class Members."

65. Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

66. Plaintiffs reserve the right to amend the definitions of the Class or add a Class or Subclass if further information and discovery indicate that the definitions of the Classes should be narrowed, expanded, or otherwise modified.

67. Numerosity: The members of the Class are so numerous that joinder of all members is impracticable, if not completely impossible. The members of the Class are so numerous that

joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time and such number is exclusively in the possession of Defendant, based on information presently available, approximately 4,000,000 individuals were impacted in the Data Breach[25].

68. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. The questions of law and fact common to the Class that predominate over questions which may affect individual Class Members, includes the following:

a. Whether and to what extent Defendant had a duty to protect the PII of Plaintiffs and Class Members;

b. Whether Defendant had a duty not to disclose the PII of Plaintiffs and Class Members to unauthorized third parties;

c. Whether Defendant failed to adequately safeguard the PII of Plaintiffs and Class Members;

d. Whether Defendant required its third-party vendors to adequately safeguard the PII of Plaintiffs and Class Members;

e. When Defendant actually learned of the Data Breach;

f. Whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class Members that their PII had been compromised;

g. Whether Defendant violated the law by failing to promptly notify Plaintiffs and Class Members that their PII had been compromised;

h. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i. Whether Defendant adequately addressed and fixed the practices, procedures, or vulnerabilities which permitted the Data Breach to occur;

j. Whether Plaintiffs and Class Members are entitled to actual damages, statutory damages, and/or nominal damages as a result of Defendant's wrongful conduct;

k. Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and ongoing harm faced as a result of the Data Breach.

---

[25] See, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/5d65af73-7d3b-4792-b675-826b53aaf23e.html (last accessed on September 8, 2025.

69. Typicality: Plaintiff's claims are typical of those of the other members of the Class because Plaintiff, like every other Class Member, was exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Class.

70. Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendant acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenges of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

71. Adequacy: Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that Plaintiffs haves no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiffs seek no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages suffered are typical of other Class Members. Plaintiffs have retained counsel experienced in complex class action and data breach litigation, and Plaintiffs intend to prosecute this action vigorously.

72. Superiority and Manageability: The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually

afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

73. The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since Defendant would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Classes and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

74. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

75. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

76. Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the PII of Classes, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

77. Further, Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class- wide basis.

78. Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendant failed to timely notify the Plaintiffs and the Classes of the Data Breach;
b. Whether Defendants owed a legal duty to Plaintiffs and the Classes to exercise due care in collecting, sharing, storing, and safeguarding their PII;
c. Whether Defendant's (or their vendors') security measures to protect its network were reasonable in light of industry best practices;
d. Whether Defendant's (or their vendors') failure to institute adequate data protection measures amounted to negligence;
e. Whether Defendant failed to take commercially reasonable steps to safeguard consumer PII;
f. Whether Defendant made false representations about their data privacy practices and commitment to the security and confidentiality of personal information; and
g. Whether adherence to the Safeguard's Rule and/or other data privacy recommendations and best practices would have prevented the Data Breach.

## <u>CAUSES OF ACTION</u>

### COUNT 1: NEGLIGENCE/WANTONNESS

79. Plaintiffs re-allege and incorporate by reference all the allegations contained in the foregoing paragraphs as if fully set forth herein.

80. Defendant obtains sensitive PII from its applicants, employees and consumers, including Plaintiffs and Class Members, in the ordinary course of business.

81. Plaintiffs and Class Members were required to entrust Defendant with their PII with the understanding that Defendant would adequately safeguard their information.

82. Defendant had full knowledge of the types of PII it collected and the types of harm that Plaintiffs and Class Members would suffer if that data was accessed and exfiltrated by an unauthorized third-party.

83. By collecting, storing, sharing, and using the Plaintiffs and Class Members' PII, Defendant assumed a duty to use reasonable means to safeguard the personal data it obtained.

84. Defendant also had a duty to employ reasonable security measures under the FTC's Safeguards Rule. Under the FTC's Safeguards Rule, Defendant's duty included a responsibility to ensure it: (i) implemented reasonable administrative, technical, and physical measures to detect and prevent unauthorized intrusions into its information technology and/or cloud environments; (ii) contractually obligated its vendors to adhere to the requirements of Defendant's privacy policy; (iii) complied with the Safeguards Rule and other applicable statutes and data protection obligations; (iv) conducted regular privacy assessments and security audits of Defendant's and/or its vendors' data processing activities; (v) regularly audited for compliance with contractual and other applicable data protection obligations; and, (vi) provided timely notice to individuals impacted by a data breach event.

85. Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits unfair or deceptive trade practices that affect commerce, such as failing to adhere to a company's own published privacy policies.

86. Defendant also had a duty to exercise appropriate clearinghouse practices to remove PII that Defendant was no longer required to retain.

87. Defendant had a duty to notify Plaintiffs and the Class of the Data Breach promptly and adequately. Such notice was necessary to allow Plaintiffs and the Class to take steps to prevent, mitigate, and repair any fraudulent usage of their PII.

88. Defendant violated its duty by failing to adhere to its own privacy policy regarding the confidentiality and security of Plaintiffs and Class Members information. Defendant further breached its duty by failing to implement an information security plan or use reasonable security measures to protect PII. Defendant's violations constitute negligence and/or wantonness.

89. Defendant's failure to adhere to its data privacy and security obligations was a reckless disregard for the Plaintiffs and Class Members' privacy rights. Defendant knew, or should have known, that its failure to take reasonable precautions might result in injury to Plaintiffs and Class Members. The negligent and wanton acts or omissions committed by Defendant includes, but is not limited to, the following:

a. Failing to designate a qualified individual to implement and supervise its information security program.
b. Failing to conduct an assessment to determine foreseeable risks and threats – internal and external – to the security, confidentiality, and integrity of customer information.
c. Failing to design and implement safeguards to control the risks identified through the risk assessment.
d. Failing to encrypt personally identifying information in transit and at rest.
e. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII.
f. Failing to adequately monitor the security of their networks and systems.
g. Allowing unauthorized access to PII.
h. Failing to detect in a timely manner that PII had been compromised.
i. Failing to remove PII it was no longer required to retain.
j. Failing to timely and adequately notify Plaintiffs and Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

90. Plaintiffs and Class Members are within the class of persons the Federal Trade Commission Act was intended to protect and the type of harm that resulted from the Data Breach was the type of harm the statue was intended to guard against.

91. The injuries resulting to Plaintiffs and the Classes because of Defendant's failure to use adequate security measures was reasonably foreseeable.

92. Plaintiffs and the Class were the foreseeable victims of a data breach. Defendant knew or should have known of the inherent risks in collecting and storing PII, the critical importance of protecting that PII, and the necessity of updating, patching, or fixing critical vulnerabilities in its network.

93. Plaintiffs and the Class had no ability to protect the PII in Defendant's possession. Defendant was in the best position to protect against the harms suffered by Plaintiffs and the Classes as a result of the Data Breach.

94. But for Defendant's breach of duties owed to Plaintiffs and the Class, their PII would not have been compromised. There is a close causal connection between Defendant's failure to implement reasonable security measures to protect the PII of Plaintiffs and the Class and the harm, or risk of imminent harm, suffered by Plaintiffs and the Classes.

95. As a result of the Data Breach, Plaintiffs and Class Members suffered injuries including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) statutory damages; (vii) nominal damages; and (viii) the continued and increased risk their PII will be misused, where: (a) their data remains unencrypted and available for unauthorized third parties to access; and (b) remains backed up under Defendant's possession or control and is subject to further unauthorized disclosures so long as Defendant fails to implement appropriate and reasonable measures to protect the PII.

96. Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

97. Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to: (i) strengthen its data protection procedures; (ii) patch all critical vulnerabilities; and (iii) to provide adequate monitoring and protection to all affected by the Data Breach.

**COUNT 2: BREACH OF IMPLIED CONTRACT**

98. Plaintiffs re-allege and incorporate by reference all the allegations contained in the foregoing paragraphs as if fully set forth herein.

99. Defendant obtains sensitive PII from their applicants and employees, including Plaintiffs and Class Members, in the ordinary course of providing services.

100. In so doing, Plaintiffs and Class Members entered implied contracts with Defendant by which Defendant agreed to use reasonable technical, administrative, and physical safeguards to protect against unauthorized access to, use of, or disclosure of the personal information it collects and stores.

101. Plaintiffs and Class Members would not have entrusted their PII to Defendant in the absence of an expressed or implied promise to implement reasonable data protection measures.

102. Plaintiffs and Class Members fully and adequately performed their obligations under the implied contract with Defendant.

103. Defendant breached the implied contract with Plaintiffs and Class Members which arose from the course of conduct between the parties, as well as disclosures on the Defendant's web site, privacy notice, and in other documents, all of which created a reasonable expectation that the personal information Defendant collected would be adequately protected and that the

Defendant would take such actions as were necessary to prevent unauthorized access to, use of, or disclosure of such information.

104. As a direct and proximate result of the Defendant's breach of an implied contract, Plaintiffs and Class Members suffered injuries including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) statutory damages; (vii) nominal damages; and (viii) the continued and increased risk their PII will be misused, where: (a) their data remains unencrypted and available for unauthorized third parties to access; and (b) remains backed up under Defendant's possession or control and is subject to further unauthorized disclosures so long as Defendant fails to implement appropriate and reasonable measures to protect the PII.

105. Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to: (i) strengthen its data protection procedures; (ii) patch all critical vulnerabilities; and (iii) to provide adequate monitoring/protection to all affected by the Data Breach.

**COUNT 3: UNJUST ENRICHMENT**

106. Plaintiffs re-allege and incorporate by reference all the allegations contained in the foregoing paragraphs as if fully set forth herein.

107. Plaintiffs bring this Count in the alternative to the breach of implied contract count above.

108. By obtaining their PII, Plaintiffs and Class Members conferred a monetary benefit on Defendant. Defendant knew that Plaintiffs and Class Members conferred a benefit upon it and has accepted and retained that benefit.

109. By collecting the PII, Defendant was obligated to safeguard and protect such information, to keep such information confidential, and to timely and accurately notify Plaintiffs and Class Members if their data had been compromised or stolen.

110. Defendant failed to secure Plaintiffs and Class Members' PII and, therefore, it would be unjust for Defendant to retain any of the benefits that Plaintiffs and Class Members conferred upon Defendant without paying value in return.

111. As a direct and proximate result of the Defendant's conduct, Plaintiffs and Class Members suffered injuries including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) experiencing an increase in spam calls, texts, and/or emails; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and increased risk their PII will be misused, where: (a) their data remains unencrypted and available for unauthorized third parties to access; and (b) remains backed up under Defendant's possession or control and is subject to further unauthorized disclosures so long as Defendant fails to implement appropriate and reasonable measures to protect the PII.

112. Plaintiffs and Class Members are entitled to restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct.

**COUNT 4: INVASION OF PRIVACY**

113. Plaintiffs re-allege and incorporate by reference all the allegations contained in the foregoing paragraphs as if fully set forth herein.

114. Plaintiffs and Class Members had a legitimate expectation of privacy in their sensitive information such as social security numbers. Plaintiffs and Class Members were entitled to the protection of this information from disclosure to unauthorized third parties.

115. Defendant owed a duty to Plaintiffs and Class Members to keep their PII confidential.

116. Defendant permitted the public disclosure of Plaintiff's and Class Members' PII to unauthorized third parties.

117. The PII that was disclosed without the Plaintiffs and Class Members' authorization was highly sensitive, private, and confidential. The public disclosure of the type of PII at issue here would be highly offensive to a reasonable person of ordinary sensibilities.

118. Defendant permitted its information technology environment to remain vulnerable to foreseeable threats, which created an atmosphere for the Data Breach to occur. Despite knowledge of the substantial risk of harm created by these conditions, Defendant intentionally disregarded the risk, thus permitting the Data Breach to occur.

119. By permitting the unauthorized disclosure, Defendant acted with reckless disregard for the Plaintiffs and Class Members' privacy, and with knowledge that such disclosure would be highly offensive to a reasonable person. Furthermore, the disclosure of the PII at issue was not newsworthy or of any service to the public interest.

120. Defendant was aware of the potential of a data breach and failed to adequately safeguard its systems and/or implement appropriate policies and procedures to prevent the unauthorized disclosure of Plaintiff's and Class Members' data.

121. Defendant acted with such reckless disregard as to the safety of Plaintiffs and Class Members' PII to rise to the level of intentionally allowing the intrusion upon the seclusion, private affairs, or concerns of Plaintiffs and Class Members.

122. Plaintiffs and Class Members have been damaged by the invasion of their privacy in an amount to be determined at trial.

**COUNT 5: UNFAIR AND DECEPTIVE TRADE PRACTICES**

123. Plaintiffs re-allege and incorporate by reference the paragraphs above as if fully set forth herein.

124. Plaintiffs and Class Members are employees, applicants, or consumers of Defendant's services. Defendant requires its employees, applicants, or consumers, including Plaintiffs and Class Members, to submit PII in the ordinary course of providing products or services.

125. Defendant gathered and stored the PII of Plaintiffs and Class Members as part of its business. Plaintiffs and Class Members entrusted Defendant with their PII with the understanding that Defendant would adequately safeguard their information.

126. Under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits unfair or deceptive trade practices that affect commerce. Deceptive practices, as interpreted by the FTC, include failing to adhere to a company's own published privacy policies. Such behavior by Defendant also constitutes a false, misleading, or deceptive act under state Unfair and Deceptive Trade Practices Act.

127. Defendant violated the state consumer protection statute by failing to adhere to its own Privacy Policy regarding the confidentiality and security of Plaintiffs and Class Members' information. Defendant further violated the state consumer protection statute by failing to use reasonable measures to protect PII.

128. Defendant's conduct created a likelihood of confusion or misunderstanding regarding its actual data privacy and security practices. Defendant promised to protect Plaintiffs and Class Members' PII via its privacy policies/notices, but allowed the unauthorized access to this personal information; Defendant failed to disclose material facts that the Plaintiffs and Class Members' PII would be disclosed to unauthorized third parties; Defendant failed to obtain Plaintiffs and Class Members' consent in transmitting their PII to a third party; and knowingly violated industry and legal standards regarding the protection of Plaintiffs and Class Members' PII.

129. Defendant's unfair or deceptive acts affected public interests, including those of Plaintiffs and Class Members. Defendant knew or should have known that it was likely to mislead its customers who were acting reasonably. Defendant engaged in unfair or deceptive practices by breaching its duties to provide technical and administrative data security policies, procedures, and practices. Defendant's failure to adhere to its published privacy policies and procedures is offensive to established public policy and is substantially injurious to consumers as evidenced by the massive Data Breach.

130. Defendant's deceptive acts, as described herein, proximately caused Plaintiffs and Class Members damages.

131. As a direct and proximate result of the Defendant's conduct, Plaintiffs and Class Members suffered damages including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) mitigation costs and expenses; and (v) attorneys' fees and court costs.

132. Plaintiffs allege that Defendant's data security measures remain inadequate.

Plaintiffs will continue to suffer injury as a result of the compromise of their PII and remain at imminent risk that further compromises of their PII will occur in the future.

133. Plaintiffs and Class Members have suffered irreparable injury and will continue to suffer injury as a result of Defendant's deceptive trade practices, which places Plaintiffs and Class Members at imminent risk that further compromises of their PII will occur in the future. As such, the remedies available at law are inadequate to compensate for that injury. Accordingly, Plaintiffs and Class Members also seek to obtain a judgment declaring, among other things, the following:

a. Defendant continues to owe a legal duty to secure PII and to timely notify consumers of a data breach.

b. Defendant continues to breach this legal duty by failing to employ reasonable measures to secure Plaintiffs and Class Members' PII.

134. The Court also should issue corresponding prospective injunctive relief requiring that Defendant employs adequate data protection practices consistent with law and industry standards.

135. The hardship to Plaintiffs if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued. Among other things, if another massive data breach occurs, Plaintiffs will likely be subjected to fraud, identity theft, and other harms described herein. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

136. The issuance of the requested injunction will not do a disservice to the public interest. To the contrary, such an injunction would benefit the public by encouraging Defendant to take necessary action to prevent another data breach, thus eliminating the additional injuries that would result to Plaintiffs and the multitude of individuals whose PII would be at risk of future unauthorized disclosures.

137. As a result of the Defendant's false, misleading, or deceptive acts, regarding its data security practices, the consuming public in general, Plaintiff, and Class Members suffered injuries including, but not limited to, the future and continued risk their PII will be misused, where: (a) their data remains unencrypted and available for unauthorized third parties to access; and (b) remains under Defendant's possession or control and is subject to further unauthorized disclosures so long as Defendant fails to implement appropriate and reasonable measures to protect the PII.

138. Plaintiffs and Class Members are entitled to attorneys' fees, costs, and injunctive relief requiring Defendant to: (i) strengthen its data protection procedures; and (ii) to provide adequate monitoring and protection to all affected by the Data Breach.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the other members of the Classes alleged herein, respectfully requests that the Court enter judgment as follows:

A. For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff(s) as the representatives for the Classes and counsel for Plaintiff(s) as Class Counsel;

B. For an order declaring the Defendant's conduct violates the statues and causes of action referenced herein;

C. For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

D. Ordering Defendant to pay for lifetime credit monitoring and dark web scanning services for Plaintiffs and the Classes;

E. For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

F. For prejudgment interest on all amounts awarded;

G. For an order of restitution and all other forms of equitable monetary relief requiring the disgorgement of the revenues wrongfully retained as a result of the Defendant's conduct;

H. For injunctive relief as pleaded or as the Court may deem proper; and

I. For an order awarding Plaintiffs and the Classes their reasonable attorneys' fees and expenses and costs of suit, and any other expense, including expert witness fees; and

J. Such other relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all claims in this Complaint and of all issues in this action so triable as of right.

Dated: September 24, 2025

Respectfully submitted,

*/s/ Paul J. Doolittle*
Paul J. Doolittle, Esq.
(SC Bar ID # 66490)
**Poulin | Willey | Anastopoulo, LLC**
32 Ann Street,
Charleston, SC 29403
Tel: 803-222-2222
Fax: 843-494-5536
Email: cmad@poulinwilley.com
Paul.Doolittle@poulinwilley.com